# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 97-3900/97-4015

_____

| | | |
|---|---|---|
| James DeJong, Sr.; James DeJong, Jr.; | * | |
| | * | |
| Appellees/Cross-Appellants. | * | |
| | * | |
| v. | * | |
| | * | Appeals from the United States |
| Sioux Center, Iowa; | * | District Court for the Northern |
| | * | District of Iowa. |
| Appellants/Cross-Appellees, | * | |
| | * | |
| | * | |
| Cotter & Company, | * | |
| | * | |
| Objector. | _____ | |

Submitted:  November 17, 1998

Filed:  February 24, 1999

_____

Before BEAM and LAY, Circuit Judges, and SIPPEL,[1] District Judge.

_____

BEAM, Circuit Judge.

James DeJong, Sr. and his son, James DeJong, Jr., leased space and opened a hardware store in a new city-owned shopping center.  Although the DeJongs opened their store, the rest of the shopping center remained under construction for the next

_____

[1]The Honorable Rodney W. Sippel, United States District Judge for the Eastern and Western Districts of Missouri, sitting by designation.

eight months, resulting in low customer traffic and low sales. The DeJongs lost money and had to close the store. They subsequently sued the city of Sioux Center (the City) for their losses. A jury awarded damages for breach of contract and promissory estoppel. The district court[2] granted judgment as a matter of law to the City on the promissory estoppel claim, but not on the contract claim. The City appeals, claiming that the district court erred in denying its motion for judgment as a matter of law on the contract claim, and the DeJongs cross appeal the court's ruling on the promissory estoppel claim. We affirm.

## I.    BACKGROUND

We relate the facts in a light most favorable to the jury verdict. See Norton v. Caremark, Inc., 20 F.3d 330, 334 (8th Cir. 1994). James DeJong, Sr. (James Sr.) had worked in the real estate industry in Lansing, Illinois, for twenty-seven years. His son, James DeJong, Jr. (James Jr.) worked in a hardware store throughout high school, earned a degree in business administration at Dordt College in Sioux Center, Iowa, then joined his father in the real estate business. In late 1989, the DeJongs began to explore the possibility of owning and operating a hardware store. They learned that the DeRuyter hardware store in Sioux Center was for sale. The DeRuyter building was scheduled to be torn down to make room for the parking area of a new mall planned by the City[3] and Mr. DeRuyter was going to retire. The DeJongs offered to buy DeRuyter's inventory and hire his store manager when the business closed.

---

[2]The Honorable Paul A. Zoss, United States Magistrate Judge for the Northern District of Iowa, presiding pursuant to the parties' consent. See 28 U.S.C. § 636(c)(1).

[3]The City of Sioux Center is not only the owner of the mall, but was the general contractor for the project as well.

In 1990, the DeJongs held discussions with the City and the realty company hired to market and negotiate leases for the new mall. They also contacted Cotter & Company, the company that controls the use of the True Value Hardware name.[4] Stan Steinert, the regional retail support representative for True Value, evaluated the market in Sioux Center and determined that it would be suitable for a store. He prepared several reports, essentially projected budgets and business plans. These business plans indicated that the DeJongs could expect gross sales of $375,000 in their first year. The plans also indicated the DeJongs would lose approximately $12,000 the first year of operations, less than $700 the second year, and operate in the black from that point on.

As the negotiations between the DeJongs, assisted by True Value, and the City continued, the DeJongs were given a promotional pamphlet stating that the mall would open in the spring of 1991. The DeJongs were also told that the opening date had been set for July 1991. The City sent a lease to the DeJongs and to True Value for their review on behalf of the DeJongs.

In November 1990, the DeJongs learned that DeRuyter had decided not to close his hardware store and sell the inventory to them, but instead sold the business as a going concern to the local Co-op which planned to move the store to a different location and continue operating the hardware business. Because this would result in more competition than they had initially anticipated, the DeJongs decided to call off the deal. On November 21, the mayor of Sioux Center called James Sr. in an effort to get the DeJongs to reconsider. He stated that there was a significant loyalty to downtown merchants, and that the DeJongs should not be concerned about competition from the Co-op, which was on the "wrong side of the tracks." The mayor

---

[4]Although the ownership of True Value is similar to a co-op arrangement, the day-to-day relationship between True Value and individual store owners is essentially that of franchiser and franchisee.

further stated that the DeRuyter store's sales had been $575,000 in 1988, and that the True Value business plans projecting sales of $375,000 were far too conservative, even with competition from the Co-op. In December, four representatives from the City flew to Lansing to visit the DeJongs at the home of James Sr. They echoed the mayor's statements and belief that, if the DeJongs opened a True Value store in the mall, the sales would easily exceed the $375,000 predicted by True Value. They also restated that the mall was scheduled to be ready for tenants by July of 1991. The discussion then turned to the terms of the lease. James Sr. had a son who would begin his last year of high school in the fall of 1991. Concerned about the impact that changing schools might have on his son, he asked if the start of the lease could be postponed until June 1992. The City responded that postponement would be unacceptable. They had sixty percent of the mall rented and the opening scheduled for September 1. If the DeJongs could not open as originally planned, the City would have to lease the space to another party it had lined up.

The DeJongs consulted Steinert of True Value, who stated that, considering the market demographics, the DeJongs should be able to attain the conservative sales projection of $375,000 even with competition from the Co-op store. The DeJongs signed a standard form lease with the City in February 1991. The lease called for an opening date of "[a]pproximately 1 September 1991." In March, the DeJongs received a newsletter from the mall's leasing agent. It stated that the mall "will be built as one unit with expected grand opening scheduled for approximately October 1, 1991."

After selling two homes and his business, James Sr. moved to Sioux Center with James Jr. and their respective families in late July 1991. On arrival, the DeJongs discovered that the mall would not be completed on time. Although there were walls in place, there were no doors or windows in the mall entrances, and the floors were nothing but dirt. There was no wall or door between the DeJongs' space and the rest

of the empty mall, the marquee sign was not built, and aside from twenty-four parking spaces for the hardware store, the parking lot was mostly dirt.

The DeJongs finished the interior of their store and eventually opened on November 6, 1991.   There were no other tenants doing business at the time. There remained no doors or windows at the mall entrances and no concrete floors in the corridors.  The DeJongs had to construct an entryway and door made of plywood. They had to hang plastic sheets across the entryway between the store and the interior of the mall in order to prevent cold wind and dirt from blowing in from the rest of the mall.   The parking lot was unlit as well as unfinished.  The buildings that were supposed to have been razed to make room for the mall parking lot were still standing, effectively blocking any view of the mall and the DeJongs' store from the main street in town.   These buildings were not demolished until sometime in December 1991. Construction continued slowly.  In May and June of 1992, much of the front parking area remained unpaved, scaffolding surrounded the marquee being built, and there were piles of dirt, construction tape and plywood signs along the roads abutting the mall.  The mall's grand opening was finally held on July 16, 1992, more than nine months after the planned event.

From the time the DeJongs' store opened, customer traffic and sales were far below expectations.  The store lost money every month.  In June 1992, the DeJongs decided to liquidate their inventory and close the store.  They had been open for less than a year, and rather than being on track to lose the projected $12,000, the store had already lost over $150,000, and James Sr. was deeply in debt.

The DeJongs attribute their business failure and financial losses directly to the fact that the mall was not complete.  They sued the City, claiming damages under several theories; fraudulent misrepresentation, negligent misrepresentation, promissory estoppel, and breach of contract.  The fraudulent misrepresentation, promissory estoppel, and contract claims were presented to the jury which found for

the City on the fraud claim and for the DeJongs on the remaining two claims. The court granted the City's post-trial motion for judgment as a matter of law on the promissory estoppel claim, but denied the motion as to the contract claim. The City appeals, arguing that the court erred when it determined the term "opening date" in the lease was ambiguous, thus allowing the contract claim to reach the jury, and also claims that there is insufficient evidence of damages. The DeJongs cross appeal the court's grant of judgment as a matter of law to the City on the promissory estoppel claim.

## II. DISCUSSION

### A. Ambiguity

The initial section of the lease entitled "Basic Lease Information," contains the essential terms of the contract. It identifies the parties, the mall (known as "The Centre"), the amount of basic annual rent due during different time periods, the amount of percentage rent, and common area charges. The term "Rent Commencement Date" is defined as "Approximately 1 September 1991 or 60 days after Landlord turns building over to tenant for set up." On the next line is the term "Opening Date," which is stated to be "Approximately 1 September 1991." The DeJongs argue that the term "opening date" refers to the opening of the mall, the date the City committed to completing the mall. The City claims that it had no obligation to complete the mall by a certain date, and that the term refers only to the opening of the DeJong's store.

A federal court sitting in diversity jurisdiction applies the law of the forum state, in this case, Iowa. See First Bank of Marietta v. Hogge, 161 F.3d 506, 510 (8th Cir. 1998). Whether a term in a contract is ambiguous is a question of law which we review de novo. See Mohamed v. Unum Life Ins. Co., 129 F.3d 478, 480 (8th Cir. 1997). Under Iowa law, the cardinal rule of contract construction is that the intent of

the parties controls. The intent may be "determined from the terms of the lease, what is necessarily implied from the terms, and the circumstances surrounding the formation and execution of the lease." Dickson v. Hubbell Realty Co., 567 N.W.2d 427, 430 (Iowa 1997). Ambiguity exists when, after the application of rules of interpretation to the face of the contract, a genuine uncertainty exists concerning which of two reasonable meanings is proper. See Service Unlimited, Inc. v. Elder, 542 N.W.2d 855, 857 (Iowa Ct. App. 1995). The test for ambiguity is objective: whether the language is fairly susceptible to two interpretations. See Iowa Fuel & Minerals, Inc. v. Iowa State Bd. of Regents, 471 N.W.2d 859, 863 (Iowa 1991). In other words, a contract term is ambiguous if, looking at the contract as a whole, it can reasonably support more than one meaning.

The district court submitted the issue of interpretation to the jury as part of the DeJongs' contract claim. The jury found for the DeJongs on the contract claim, i.e. that the City breached the contract by failing to have the mall complete and open by approximately September 1, 1991. The court held a hearing on post-trial motions, during which both parties argued the issue of ambiguity. The court found that the term was ambiguous as a matter of law and allowed the jury's verdict to stand. See DeJong v. City of Sioux Center, 980 F. Supp. 1010, 1016 (N.D. Iowa 1997). The City argues that the district court erred by failing to apply the pertinent rules of interpretation before concluding the term "opening date" was ambiguous, and that the rules of interpretation, properly applied, would remove any ambiguity, thus leaving no issue for the jury.

We agree with the district court's finding that the term "opening date" is ambiguous. Contrary to the City's assertion, no rule of interpretation effectively removes the ambiguity. The application of the pertinent rules of interpretation merely highlights the ambiguity of the term. The first rule of interpretation is to examine the plain meaning of the term. See Iowa Fuel, 471 N.W.2d at 862-63. By its plain meaning, "opening date" does not specifically refer to the opening of the mall or the

opening of the DeJongs' store, and can fairly support either interpretation. Even considering, as Iowa law allows, the purpose of the lease and the circumstances surrounding its execution, Dickson, 567 N.W.2d at 430, the ambiguity remains. The purpose of the lease was to contract for space for a new store in a new mall. There is ample reason for either interpretation because two "openings" are necessarily contemplated.

It is well established that contracts should be interpreted as a whole, and contractual terms should be interpreted in the context in which they are used rather than in isolation. See Iowa Fuel, 471 N.W.2d at 863. In the same "basic information" section of the lease where the term "opening date" is defined as "[a]pproximately 1 September 1991," the lease details the timing and calculations for three different types of payment. The first is the annual rent, based on square footage, which begins on the "rent commencement date." The others are the percentage rent, and the common area charges. The DeJongs obligations for these amounts begin with the opening date. The percentage rent is based on sales volume (a set percent of sales over a minimum sales figure each year) and necessarily assumes that the tenant must be open for business in order to have sales. This could be read to infer that "opening date" indicates the opening of the store, but it is not the necessary conclusion. For the City's interpretation to prevail, one must assume that a tenant was expected to be open for business in a largely incomplete mall. There is no indication in the lease that such a scenario was contemplated by either party. The fact that the opening date triggers the common area charges is similarly inconclusive. On one hand, a logical inference is that, prior to the opening of the store, the tenant, because it has no customers, is not utilizing any of the common areas. On the other hand, if the mall is not open, there are no completed common areas for the tenant to use, thus no obligation to pay the charges.

The City argues that a clause in article two of the lease conclusively indicates that "opening date" means the date the tenant opens for business. The clause reads

-8-

in pertinent part: "Tenant's obligation to pay rent shall . . . commence upon the earlier of the following dates: (i) . . . (ii) the date on which the tenant shall open . . . for business." By tying the opening of the store to rent, this does lend some support to the City's position. However, even in the lease, the common area charges are not referred to as "rent," and the reference to article two fails to rebut the reasonable interpretation of the DeJongs based on the use of "opening date" to trigger common area charges. This argument also begs the question why, if the tenant's opening date is spelled out so clearly in article two, it was not given similar treatment in the basic information section of the same standard form document.

Another well-established rule of contract interpretation is that an "interpretation which gives a reasonable, lawful, and effective meaning to all terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect." Fashion Fabrics of Iowa, Inc. v. Retail Investors Corp., 266 N.W.2d 22, 26 (Iowa 1978). The City argues that if "opening date" is interpreted to mean the opening of the mall, then the automatic termination clause is rendered superfluous. The termination clause reads: "In the event that either Premises [defined in the lease as the DeJongs' space 304] are not ready for occupancy or the Rent Commencement Date has not occurred within six (6) months following September 1, 1991, this Lease will automatically become null & void; . . . ." The City's reasoning is flawed. By its plain language, this clause deals solely with the possibility of the *tenant's* space not being ready. Nothing is mentioned about the common areas or the rest of the mall. This rule of interpretation cited by the City actually better supports the DeJongs' interpretation. If, as the City argues, the term "opening date" does not mean the opening of the mall, then under the lease, the city has no obligation to actually build a mall, merely the single space leased by the DeJongs. This would not only render superfluous those portions of the lease pertaining to the common areas, but the entire lease would be unreasonable as well. The lease was negotiated as, and purports to be, a lease for a space *in a mall*, with the attendant synergy of retail activity among the

various tenants. The City cannot claim that its obligations could be met by simply building the DeJongs' space then abandoning the project.

In summary, the application of the above rules is inconclusive at best, and demonstrates that the term "opening date" is ambiguous. "If the language is found to be ambiguous, extraneous evidence is admissible as an aid to interpretation of the contract." Dickson, 567 N.W.2d at 430. In Iowa, interpretation of contractual terms is an issue for the court unless it turns on extrinsic evidence or a choice among reasonable inferences. See Iowa-Illinois Gas & Elec. Co. v. Black & Veatch, 497 N.W.2d 821, 825 (Iowa 1993). Whether the City breached the contract depends on the term's interpretation, thus the issue was properly presented to the jury. See id. Consequently, the use of extrinsic evidence on the issue was proper. See Kroblin v. RDR Motels, Inc., 347 N.W.2d 430, 433 (Iowa 1984) ("[E]xtrinsic evidence is admissible as an aid to interpretation when it sheds light on the situation of the parties, antecedent negotiations, the attendant circumstances, and the objects they were striving to attain.").

The jury was instructed that ambiguous terms are construed against the drafter. This is a standard rule of Iowa contract law. See, e.g., Iowa Fuel, 471 N.W.2d at 863; Archibald v. Midwest Paper Stock Co., 176 N.W.2d 761, 764 (Iowa 1970). The City now argues that this familiar rule of *contra proferentem* should not apply in this case. For support, the City relies on Kinney v. Capital-Strauss, Inc., 207 N.W.2d 574 (Iowa 1973), which states that ambiguities should not be automatically construed against the drafter when "the instrument is prepared with the aid and approval, and under scrutiny of legal counsel for both of the contracting parties." Id. at 577. The argument has little merit. The DeJongs were presented with a standard form lease, and although it was reviewed by the DeJongs' attorney and by representatives of True Value, only five paragraphs of the twenty-page document were crossed out and names, dates, and amounts were filled in in the basic information section. This cannot place the contract within the scope of Kinney. Simply because a few

-10-

paragraphs were crossed out and initialed does not mean that the remaining language was the result of a collaborative effort as in <u>Kinney</u>, where counsel communicated with each other, creating several drafts before producing the final version of the contract.  <u>See</u> <u>id.</u> at 575.

Since we hold that the lease is ambiguous, the determination of which meaning is given to that term by the jury is a question of fact, <u>Mohamed</u>, 129 F.3d at 480, which we review only to determine whether the verdict is supported by substantial evidence, viewed in the light most favorable to sustaining the verdict.  <u>See</u> <u>Norton</u>, 20 F.3d at 337.  Given the definition of ambiguity, the proffered interpretations of both parties were reasonable.  Ambiguity allows the consideration of extrinsic evidence.  Based upon the circumstances surrounding the lease, and the prior representations made by the City concerning the mall's opening date, a jury could easily understand the term in the lease to be another representation pertaining to the opening of the mall, an issue at the heart of the agreement.  In short, the factual finding by the jury, that the term "opening date" referred to the opening of the mall, is supported by substantial evidence and we find no reason to set it aside.

## B.    Causation

The City also attacks the damage award, claiming that the evidence presented was insufficient, leaving the jury to speculate as to both causation and amount.  The DeJongs needed to establish several elements to complete the causal chain: (1) that absent the breach, they would have had sufficient sales to remain in business; (2) the lack of customer traffic in the mall was due to the fact that the mall remained incomplete and under construction; (3) the lower than anticipated sales were substantially caused by lower than anticipated customer traffic in the mall; and (4) they were forced to close their business and suffered losses because of lower than anticipated sales.

Proof of causation is a jury question. See Oak Leaf Country Club, Inc. v. Wilson, 257 N.W.2d 739, 746 (Iowa 1977). The evidence may be direct or circumstantial, and if circumstantial, the evidence must be sufficient to make the plaintiff's asserted theory reasonably probable, not merely possible, and more probable than any other theory based on the evidence. See id. The plaintiff is not required to prove his theory of causation by evidence so clear as to exclude every other possible theory. See Latham v. Des Moines Elec. Light Co., 296 N.W. 372, 375 (Iowa 1941). It is generally for the jury to say whether circumstantial evidence meets this test. See Oak Leaf, 257 N.W.2d at 746. "If the jury believed plaintiff's experts and the supporting circumstances in the record, the evidence was sufficient to justify a finding [in favor of the plaintiff's theory of causation.]" Latham, 296 N.W. at 375.

Viewed in the light most favorable to the verdict, there is substantial evidence to support the jury's finding that the City's breach was the proximate cause of the DeJongs' losses. The mall remained unfinished and under construction well into the summer of 1992, and maintained the appearance of a construction site rather than an open and inviting retail shopping center. The jury was shown video footage of both the interior and exterior of the mall as it existed and appeared at various times from September 1991 through June 1992. The jury also heard testimony regarding the condition of the mall and the attendant lack of customer traffic from the DeJongs and others.

The City argues that, because there was no statistical data presented regarding customer traffic at the mall or the DeJongs' store, and no testimony directly showing that residents of Sioux Center were unaware that the DeJongs' store was open, the jury was necessarily forced to speculate as to causation. The City confuses speculation with reliance on common sense and personal experience. Direct evidence and statistical data are not required. As explained above, the jury was free to find circumstantial evidence sufficient to overcome the alternative possible causes for the DeJongs' failure that the City advanced. Given the evidence presented on the

-12-

condition of the mall, the jury could easily infer that potential customers were either unaware that the DeJongs' store was open, or if they were aware that the store was open, they nonetheless preferred to shop in more convenient and inviting surroundings. Similarly, the relationship between low traffic and low sales, and the closing of the store due to heavy losses, are easily understood and do not require statistical information or expert witnesses.

## C.    Lost Sales

The City also claims that the "new business rule" precludes the jury from arriving at an amount for damages without speculation. The City's argument is misplaced. The new business rule generally precludes recovery of the anticipated profits or revenues of new commercial enterprises because they are deemed too uncertain and speculative. See, e.g., Harsha v. State Savings Bank, 346 N.W.2d 791, 797 (Iowa 1984). However, the DeJongs do not claim lost profits or lost sales, rather they claim the amount of their investment that was lost *due to* unrealized sales.[5] There is nothing speculative about the amount of investment lost by the DeJongs. Testimony by the DeJongs as well as financial statements entered into evidence establish the amount of the investment lost.

The amount of anticipated profits or sales not realized by the DeJongs is actually the first element of the causal chain—that but for the breach, the DeJongs would have enjoyed sufficient sales to remain open. The City has offered no cases in Iowa or any other state where the new business rule has been expressly applied to prevent a plaintiff from establishing an element of causation, as opposed to the quantity of damages, and we decline to expand its application. We believe that the

---

[5]This is an acceptable measure for damages in Iowa when the facts support it. See Farm-Fuel Products Corp. v. Grain Processing Corp., 429 N.W.2d 153, 160 (Iowa 1988).

Iowa Supreme Court, given the facts of this case, would likewise find the new business rule inapplicable for two reasons. First, because the evidentiary standards for damages and causation are different. Damages must be established to a reasonable certainty, thus the rule that new businesses without any history or track record have no ability to establish what their sales would have been. See Harsha, 346 N.W.2d at 797. Causation, on the other hand, entails a less rigorous standard, and must simply be established as more probable than any other theory advanced and supported by the evidence. See Oak Leaf, 257 N.W.2d at 746.

Second, assuming *arguendo* that the establishment of anticipated revenues of a new enterprise as a causal element is subject to the application of the new business rule, as the City suggests, the evidence presented would defeat the rule under Iowa law. As a general rule, anticipated profits from new businesses are not recoverable because they are too uncertain and speculative, however, "if factual data [is] presented which furnish[es] a basis for compilation of probable loss of profits, evidence of future profits should be admitted and its weight, if any, should be left to the jury." Harsha, 346 N.W.2d at 798. In Harsha, the plaintiff was allowed to establish, through expert testimony, the lost profits suffered by a start-up feed lot when a bank reneged on a promise to loan money. The expert explained that, in forming his opinion, he considered the market, other similar operations, actions of the bank, newness of the business, effect of property management, and work habits. He pointed out that there was guidance available if management skills were lacking. The court held that "[i]n this case we have projections of profitability based on experience in the industry; the expert's consideration of the projections and his own experience with new business; the willingness of Harsha to put in the time and effort needed." Id. at 798-99.

This case is analogous to Harsha. Steinert, the retail representative for True Value, testified at length. His sale projections were based on market research, the demographics of Sioux Center, his personal experience, and the experience of all the

other True Value stores in the region, data from the National Association of Hardware Retailers, as well as the existence of the Co-op as a competitor.  As franchisees, the DeJongs had assistance and guidance available to make up for any lack of management experience, and the DeJongs' store was part of an established and successful chain of hardware stores utilizing proven purchasing, merchandising, and advertising programs provided by True Value.  This basis for Steinert's revenue forecast is sufficient to provide a measure of reasonable certainty in lieu of an actual track record and to overcome the bar of the new business rule.  Accord  No Ka Oi Corp., v. National 60 Minute Tune, Inc., 863 P.2d 79, 82-84 (Wash. Ct. App. 1993) (nature of nationwide franchise dispels the original rationale for the new business rule).

### D.    Promissory Estoppel

The DeJongs appeal the district court's grant of judgment as a matter of law to the City on the promissory estoppel claim.  We agree with the district court that, under Iowa law, the existence of a valid integrated contract between the parties precludes a claim of promissory estoppel to essentially inject terms or conditions into the contract.  We can add nothing to the district court's well-reasoned discussion on this issue. See DeJong, 980 F. Supp. at 1013-14.

### III.   CONCLUSION

For the above reasons, the order of the district court is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.