**HOG SLAT, INC., Plaintiff,**

v.

**Roger EBERT, Defendant.**

**No. C99–3039 MWB.**

United States District Court,
N.D. Iowa,
Central Division.

July 15, 2000.

Angel A. West, Michael W. Thrall, Nyemaster, Goode, Voights, West, Hansell & O'Brien, P.C., Des Moines, IA, for Plaintiff.

Timothy J. Walker, Danette L. Kennedy, Whitfield & Eddy, P.L.C., Des Moines, IA, for Defendant.

## MEMORANDUM OPINION AND ORDER REGARDING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

BENNETT, Chief Judge.

### TABLE OF CONTENTS

I.   INTRODUCTION AND BACKGROUND ...................................1114

II.  SUMMARY JUDGMENT STANDARD ....................................1115

III. LEGAL ANALYSIS ..............................................1115
   1. Does a genuine issue of material fact exist as to whether Ebert intended to receive any income and profits from hogs finished in the hog finishing barn pursuant to the Hormel contract? ...................1116
   2. Is Ebert's counterclaim for lost income and profits prohibited under the "new business rule" because it is too remote and speculative?....1119
   3. Does Ebert's counterclaim for lost income and profits fail as a matter of law because the Hormel contract still exists?........................1121
   4. Does Ebert's counterclaim for lost income and profits fail as a matter of law because Ebert allegedly would not have made any money had he put hogs in the finishing barn? ...................................1122

IV.  CONCLUSION ...................................................1123

In this case, plaintiff Hog Slat, Inc. calls upon the court to determine whether or not defendant Ebert's counterclaim for lost income and profits is "hog-wash"—that is, whether or not there exists a genuine issue of material fact on this counterclaim.

## I. INTRODUCTION AND BACKGROUND

On February 10, 1998, Roger Ebert ("Ebert") and his nephew, Joel Hansen (Hansen), entered into a hog production contract with Hormel Foods ("Hormel"). Ebert co-signed on the Hormel contract because of Hansen's young age and inexperience. In the contract, Hansen was identified as the "producer" and "owner," and Ebert was identified as the "co-signer." Thereafter, on August 20, 1998, Ebert entered into a different contract with Hog Slat, Inc. ("Hog Slat") for the construction of a 1000 head hog finishing barn in Kilkenny, Minnesota. It was anticipated that this hog finishing barn was to house and raise hogs until they were ready to be butchered, at which time the hogs would then be marketed to Hormel pursuant to the February 10, 1998, hog production contract. Hog Slat began construction of the hog barn toward the end of September, 1998. Hog Slat billed Ebert for the slats and beams that were delivered to the barn, and Ebert made payment to Hog Slat. As the construction project progressed, Hog Slat billed Ebert at intervals for additional equipment delivered and installed. Ebert refused to make payment to Hog Slat, claiming that Hog Slat failed to construct the barn according to the terms of the contract.

On April 13, 1999, Hog Slat commenced an action in the Iowa District Court for Humbolt County against Ebert for breach of contract. Thereafter, on May 11, 1999, Ebert removed this action to the United States District for the Northern District of Iowa pursuant to 28 U.S.C. § 1441 and 28 U.S.C. § 1446, and counterclaimed for breach of contract and breach of warranties. In this counterclaim, Ebert asserted a claim for loss of income and profits as part of his damages. It is on this claim—lost income and profits—that Hog Slat bases its May 2, 2000, Motion for Partial Summary Judgment.

Both parties disagree about whether Ebert intended to receive any income and profits from the hogs raised in the finishing barn. Hog Slat asserts that there is no genuine issue of material fact as to the issue of lost income and profits. Specifically, Hog Slat sets forth four reasons in support of its motion for partial summary judgment on this claim. First, Hog Slat contends that at the time Ebert signed the contract with Hog Slat, Ebert never intended to run the hog operation, nor did he intend to receive or contemplate receiving any compensation or profits from the hog operation. Second, Hog Slat contends that any alleged lost income and profits cannot be proved with reasonable certainty, and, therefore, this counterclaim fails under the "new business rule." Third, Hog Slat asserts that because the hog production contract with Hormel was never terminated, Ebert could continue to produce hogs, which in turn would generate income and profits, if he wanted. Finally, Hog Slat contends that if Ebert had put hogs in the barn, Ebert would have lost money because the hog market and hog prices have been bad for the past two to three years. Therefore, Hog Slat asserts that based on the foregoing reasons, Ebert's counterclaim for lost income and profits due to the finishing barn being allegedly unfit for raising hogs, should fail as a matter of law, because no genuine issue of material fact exists on this claim.

In contrast, Ebert contends that Hog Slat is not entitled to partial summary judgment with respect to the issue of lost income and profits because Ebert asserts that genuine issues of material fact exist regarding this claim. Specifically, Ebert asserts that as a party to the Hormel contract, he is entitled to receive income and profits from hogs produced in the Hog Slat finishing barn. Ebert also asserts that the "new business rule" does not preclude him from establishing lost income

and profits with sufficient certainty. Ebert further asserts that there is evidence sufficient to create a fact question as to whether he would have realized a profit had his hog finishing barn been properly constructed.

## II.  SUMMARY JUDGMENT STANDARD

This court has considered in some detail the standards applicable to motions for summary judgment pursuant to FED. R.CIV.P. 56 in a number of prior decisions. *See, e.g., Swanson v. Van Otterloo,* 993 F.Supp. 1224, 1230–31 (N.D.Iowa 1998); *Dirks v. J.C. Robinson Seed Co.,* 980 F.Supp. 1303, 1305–07 (N.D.Iowa 1997); *Laird v. Stilwill,* 969 F.Supp. 1167, 1172–74 (N.D.Iowa 1997); *Rural Water Sys. # 1 v. City of Sioux Ctr.,* 967 F.Supp. 1483, 1499–1501 (N.D.Iowa 1997), *aff'd in pertinent part,* 202 F.3d 1035 (8th Cir.2000); *Tralon Corp. v. Cedarapids, Inc.,* 966 F.Supp. 812, 817–18 (N.D.Iowa 1997), *aff'd,* 205 F.3d 1347 (8th Cir.2000) (Table op.); *Security State Bank v. Firstar Bank Milwaukee, N.A.,* 965 F.Supp. 1237, 1239–40 (N.D.Iowa 1997); *Lockhart v. Cedar Rapids Community Sch. Dist.,* 963 F.Supp. 805 (N.D.Iowa 1997). Thus, the court will not consider those standards in detail here. Suffice it to say that Rule 56 itself provides, in pertinent part, as follows:

Rule 56.  Summary Judgment

(a) For Claimant.  A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

(b) For Defending Party.  A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

FED.R.CIV.P. 56(a)–(c) (emphasis added). Applying these standards, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.,* 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.,* 906 F.2d 1234, 1237 (8th Cir.1990).  An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman,* 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).  As to whether a factual dispute is "material," the Supreme Court has explained, "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Beyerbach v. Sears,* 49 F.3d 1324, 1326 (8th Cir.1995); *Hartnagel,* 953 F.2d at 394.  If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.,* 113 F.3d 1484, 1492 (8th Cir.1997).  With these standards in mind, the court turns to consideration of Hog Slat's motion for partial summary judgment on Ebert's lost income and profit counterclaim.

## III.  LEGAL ANALYSIS

As indicated previously, Hog Slat sets forth four reasons in support of its motion

for partial summary judgment on Ebert's counterclaim of lost income and profits. Thus, the court will determine whether summary judgment is appropriate in light of Hog Slat's proffered reasons, addressing each one *seriatim.*

1. ***Does a genuine issue of material fact exist as to whether Ebert intended to receive any income and profits from hogs finished in the hog finishing barn pursuant to the Hormel contract?***

█ Hog Slat asserts that Ebert never intended to receive any income and profits from hogs finished in the hog finishing barn. This is so, Hog Slat contends, despite Ebert's contract with Hog Slat for the construction of the finishing barn. In support of this assertion, Hog Slat directs the court to those portions of Ebert's deposition in which he testified that any money generated as a result of the hog operation would go towards paying off the loan for the finishing barn, and any money left over—that is, any monetary compensation or profits received for co-signing the Hormel contract with Hansen would go directly to his nephew. Hog Slat also points out Ebert's testimony regarding his physical incapability of running a hog operation, and that his reason for building the finishing barn was to help his nephew start his own hog operation. Furthermore, in its reply brief, Hog Slat claims that the affidavit Ebert submitted with his resistance to the motion for partial summary judgment contradicts his prior deposition testimony, because in the affidavit, Ebert states that he intended to receive payments for the sale of hogs made to Hormel. Hog Slat argues because Ebert's affidavit contradicts his prior deposition testimony, the court should disregard the subsequent affidavit. In sum, therefore, Hog Slat argues that based on Ebert's own admissions, in his deposition, he never contemplated receiving any income and profits from the hog operation in the finishing barn, thus precluding Ebert from making any claim for lost income and profits.

In contrast, Ebert asserts, in his affidavit, that, as a co-signer to the Hormel contract, he intended to receive payments from Hormel, including income and profits. Ebert asserts that the monies he intended to receive were to be applied to the financial obligation Ebert and Hansen have with their loan lender, Ag Star. Ag Star loaned money for the construction of the hog finishing barn, and Ebert contends that he intended to pay off this loan from the payments he received from Hormel. In the alternative, Ebert argues that because his nephew, Hansen, assigned his right, title, and interest past, present and future under the terms of the Hormel contract, and all matters involved in this current lawsuit to him, his right to sue for loss of profits and costs is unassailable. *See Red Giant Oil Co. v. Lawlor,* 528 N.W.2d 524, 533 (Iowa 1995) (stating that choses in action for breach of contract are assignable in Iowa). Therefore, Ebert contends that because of the assignment, he is clearly entitled to receive income and profits from hogs produced in the Hog Slat finishing barn.

Contrary to Hog Slat's assertion, the court is persuaded that Ebert's deposition testimony and subsequent affidavit create a genuine issue of material fact regarding whether Ebert intended to receive income and profits from the Hormel contract. This is so, because the court is not convinced, unlike Hog Slat, that Ebert unambiguously stated he never intended to receive income and profits from the Hormel contract. The court emphasizes the several instances during Ebert's deposition when he states that he intended to receive income and profits from the Hormel contract. For example, the following portion of his deposition testimony evinces Ebert's intent to receive income and profits:

Q: True, but you wouldn't stand to lose any money if the hogs didn't get in there; is that right?

A: Yes, I would.

Q: You would?

A: Yes.

Q: And how is that? Let's just step back. As I understand it, when you testified earlier today, you co-signed with Joel Hansen for the Hormel contract, but you were not going to receive any monetary compensation whatsoever.

A: No.

Q: So, how did you stand to lose money by the hogs not getting in?

A: Well, if he loses, I lose, then, too.

Deposition of Roger Ebert at 53. The court also points to the following portion of Ebert's deposition testimony:

Q: Well, we've covered this once before, and in fact I think twice, now. Maybe we need to go back one more time. You would not get any revenue from the hogs going through that hog barn, right?

A: Well, yeah, I would, I'd have to get revenue. How I would make my payments?

Q: You've told me at least twice today that you were not getting any money. You would not get any money. This contract was for your nephew and that he was going to run the hogs through the barn?

A: Yeah, but I would get money enough that I'd be able to make my payments.

*Id.* at 184. Ebert further testified that the checks from Hormel were made out to him, and that he would then turn a portion of this check over to Ag Star to pay off his loan. *Id.* at 185.

Therefore, although there are times during Ebert's deposition in which he states that he did not intend to receive income and profits from the Hormel contract, as pointed out by Hog Slat in its brief, there are likewise times during his deposition when Ebert states that he did intend to receive income and profits from the Hormel contract. Despite these apparent discrepancies in Ebert's deposition testimony, Hog Slat accuses Ebert of submitting an affidavit that contradicts his prior deposition testimony for the sole purpose of defeating its motion for partial summary judgment on this counterclaim. In so do-

ing, Hog Slat requests that this court, under the rule articulated in *Camfield Tires, Inc. v. Michelin Tire Corp.,* 719 F.2d 1361 (8th Cir.1983), disregard Ebert's affidavit, thereby eliminating any genuine issue of material fact concerning whether Ebert intended to receive income and profits.

This court has with some frequency considered the question of whether eleventh-hour affidavits that contradict deposition testimony can generate a genuine issue of material fact precluding summary judgment. *See Loeckle v. State Farm Automobile Ins. Co.,* 59 F.Supp.2d 838, 856–58 (N.D.Iowa 1999) (holding that plaintiff's affidavit failed to fall within the exception stated in *Camfield* that an affidavit contradicting the prior deposition testimony of the affiant but containing an adequate explanation for the disparity may create a genuine issue of fact because plaintiff's deposition testimony was so contradictory from the statements contained in her affidavit); *Longstreth v. Copple,* C97–4100–MWB, slip op. at 18–22 (N.D.Iowa May 6, 1999) (holding that the court could not conclude that the plaintiff's deposition testimony was so contradictory of the statements contained in plaintiff's affidavit as to foreclose the affidavit's use for summary judgment purposes); *Waitek v. Dalkon Shield Claimants Trust,* 908 F.Supp. 672, 684–686 (N.D.Iowa 1995) (holding that the affidavit of an expert proffered in opposition to summary judgment motion was assertedly in conflict with the expert's prior deposition testimony, but the court found that the affidavit could generate genuine issues of material fact, because the expert explained the basis for his apparently changed opinion); *Kunzman v. Enron Corp.,* 902 F.Supp. 882, 896–98 (N.D.Iowa 1995) (holding that affidavits of two former co-workers would be considered and allowed to create a genuine or substantial factual issue, even though the plaintiff stated in his deposition that he was unaware of the co-workers' knowledge, where the co-workers' affidavits specifically referred to a statement made in their pres-

ence and which the defendants had not challenged in any manner); *Rowson v. Kawasaki Heavy Indus., Ltd.,* 866 F.Supp. 1221, 1229–31 (N.D.Iowa 1994) (holding that a belated affidavit could be considered where the affiant's memory was recently refreshed by photographs that he had not been shown during the deposition); *see also Laird v. Stilwill,* 969 F.Supp. 1167, 1173 (N.D.Iowa 1997) (noting the general rule that an affidavit that is in direct contradiction of or inherently conflicts with the affiant's prior deposition testimony fails to raise an issue of material fact). The general rule cited in these decisions, based on the holding of the Eighth Circuit Court of Appeals in *Camfield Tires, Inc. v. Michelin Tire Corp.,* 719 F.2d 1361 (8th Cir.1983), is that an affidavit that is in direct contradiction of or inherently conflicts with prior deposition testimony by the affiant does not raise an issue of material fact, although an exception to the rule may be shown where the affiant explains apparent inconsistencies or demonstrates a plausible reason for a change. *See also Herring v. Canada Life Assurance Co.,* 207 F.3d 1026 (8th Cir.2000) (citing and applying the rule in *Camfield*); *Schiernbeck v. Davis,* 143 F.3d 434, 436–39 (8th Cir.1998) (same); *American Airlines, Inc. v. KLM Royal Dutch Airlines, Inc.,* 114 F.3d 108, 111–12 (8th Cir.1997) (same). The court will therefore scrutinize Ebert's affidavit to determine if it presents a plausible explanation for its discrepancies with his prior testimony or other factors justifying an exception to the rule stated in *Camfield* and whether the affidavit generates a genuine issue of material fact precluding partial summary judgment.

The circumstances in this case, however, do not fit squarely within the rule articulated in *Camfield.* Indeed, if the court were to look only at those portions of Ebert's deposition testimony cited above, Ebert's deposition testimony would fully support his affidavit. Similarly, if the court were to look only at those portions of Ebert's deposition testimony cited by Hog Slat in its brief, Ebert's deposition testimony would directly contradict his affida-

vit. Thus, while it is clear that Ebert testified at his deposition that he did not intend to receive any income and profits from the Hormel contract, it is equally clear that Ebert testified, during the same deposition, that he did intend to receive income and profits from the Hormel contract. Because of the inherent discrepancy in Ebert's deposition testimony regarding the issue of whether or not he intended to receive income and profits, the court does not perceive a direct contradiction between Ebert's deposition and affidavit. *See Kim v. Ingersoll Rand Co.,* 921 F.2d 197, 199 (8th Cir.1990) (finding that the apparent discrepancy in plaintiff's trial testimony and his earlier deposition testimony created a credibility question for the jury). Ebert's deposition testimony may well be such as to warrant impeachment at trial, but the court cannot say that the statements of deponent Ebert were so contradictory of the statements contained in his affidavit as to foreclose the affidavit's use for summary judgment purposes. *See Kennett–Murray Corp. v. Bone,* 622 F.2d 887, 894 (5th Cir.1980) ("In light of the jury's role in resolving questions of credibility, a district court should not reject the content of an affidavit even if it is at odds with statements made in an earlier deposition."). The court finds Ebert's affidavit sufficient to establish the existence of a triable fact issue.

In the alternative, even if one took the view that a direct contradiction exists between Ebert's deposition and affidavit, the court finds that his deposition testimony denotes confusion on his part. *See Loeckle,* 59 F.Supp.2d at 857 (finding that the plaintiff's deposition testimony does not denote confusion on her part). Indeed, the number of times that the attorney who deposed Ebert had to revisit the issue of lost income and profits with Ebert indicates to the court that Ebert was, in fact, confused. Because of this confusion, even though Ebert's affidavit makes no mention of his prior inconsistent statement contained in his deposition, the court finds that this is the unique type of situation in

which a subsequent affidavit is appropriate to clarify, rather than contradict, a deposition. *See Herring,* 207 F.3d at 1031. Throughout his deposition, Ebert consistently testified that he intended to use the money received from Hormel to pay off his loan to Ag Star. This testimony is no different from Ebert's subsequent affidavit in which he stated that the "monies received from Hormel were intended to pay off a note owing to Ag Star." Affidavit of Roger Ebert at 2. Therefore, the court finds that Ebert's affidavit is sufficient to establish the existence of a triable fact issue as to whether Ebert intended to receive any income and profits for hogs produced in the hog barn, pursuant to the Hormel contract. Accordingly, the court denies Hog Slat's motion for partial summary judgment on the issue of lost income and profits premised upon the assertion that Ebert never intended to receive such income and profits. Having concluded that there is a genuine issue of material fact that Ebert intended to receive income and profits based on his statements alone, the court need not address Ebert's alternative argument—the affect of Hansen assigning his right, title, and interest past, present and future under the terms of the Hormel contract and all matters involved in this current lawsuit to Ebert.

## 2. Is Ebert's counterclaim for lost income and profits prohibited under the "new business rule" because it is too remote and speculative?

Hog Slat argues that even if Ebert intended to receive revenue or compensation relating to the production of hogs in the barn from the Hormel contract, it is still entitled to judgment as a matter of law on this issue, because any claim for lost income and profits is too speculative. Hog Slat asserts that courts in Iowa recognize the "new business rule," which it contends "treats 'potential profits from an untried business' as too speculative to be recoverable." *See Harsha v. State Savings Bank,* 346 N.W.2d 791, 797 (Iowa 1984) (citation omitted). Here, Hog Slat asserts that because Ebert has not run a hog operation of any sort since 1980, and because Hansen has never run a hog operation in his entire life, there simply is no way that projections as to lost profits could be made without speculation. Hog Slat also asserts that the hog barn has never been used so there are no records concerning the cost of operation, or any history with Hormel, to consider in order to project lost profits. Lastly, Hog Slat asserts that the hog market has been very volatile over the past two to three years, making projections as to profits virtually impossible. For all these reasons, therefore, Hog Slat contends that any projections for lost income and profits would be too speculative, entitling it to judgment as a matter of law on this issue.

In contrast, Ebert contends that he has significant factual data furnishing a basis for compilation of probable loss of profits so as to overcome the "new business rule." Ebert asserts that his long-term contract with Hormel establishes certainty as to the market for the hogs and price. Ebert also asserts that the testimony of his son Nathan, who is also engaged in the hog production business, and Hansen establish the price that Ebert would have received for his hogs if Hog Slat's hog finishing barn were operable. This is so, because Ebert contends that his contract with Hormel is identical to the contract that Nathan has with Hormel. Ebert points out that Nathan's hog finishing barn is equal in size, and offers the same capacity for hogs, as does Ebert's finishing barn. Ebert further asserts that Nathan's hog operation is similar to his intended operation, and based on the $20,000 profit that Nathan realized from a batch of hogs started on July 20, 1999, in addition to Nathan's anticipated profits from his current batch, Ebert argues that he would have similar profits had Hog Slat provided a barn capable of being used to finish hogs. Thus, Ebert claims that, based on the foregoing data, he has produced significant factual data with a substantial certainty to show the amount of profit that he would have realized so as to overcome the "new busi-

ness rule," defeating Hog Slat's motion for partial summary judgment on this counterclaim.

■■ Indeed, Iowa does recognize the "new business rule," which generally precludes recovery of the anticipated profits or revenues of new commercial enterprises because they are deemed too speculative. *DeJong v. Sioux Center, Iowa*, 168 F.3d 1115, 1122 (8th Cir.1999) (citing *Harsha v. State Savings Bank*, 346 N.W.2d 791, 798 (Iowa 1984)). The rationale underlying the rule is that there is no available data of past business from which anticipated profits could be established. *Employee Benefits Plus, Inc. v. Des Moines General Hospital*, 535 N.W.2d 149, 156 (Iowa App. 1995) (citing *Harsha*, 346 N.W.2d at 797). The rule, however, is not absolute. *Id.* (citation omitted). If factual data furnishing a basis for probable loss of profits is presented, evidence of future profits may be admitted and its weight should be left to the fact-finder. *Harsha*, 346 N.W.2d at 798. Thus, the question is whether a prospective loss of net profits has been shown with reasonable certainty.

In order to interpret the "new business rule," the Eighth Circuit Court of Appeals, in *Independent Business Forms, Inc. v. A-M Graphics, Inc.*, 127 F.3d 698 (8th Cir.1997), sought guidance from other courts, *see e.g. Vickers v. Wichita State Univ., Wichita*, 213 Kan. 614, 518 P.2d 512 (1974) (allowing the use of established television and advertising market industry profits to form basis of lost profits estimate for new television contract), summarizing the holdings in those cases as follows:

> [T]he general rule that a new business cannot recover lost profits should not be applied when the profits of a similar, predecessor company are available to form the basis for an estimate of lost profits. When the appropriate facts and circumstances are present, even a new business may recover lost profits.

*Id.* at 704. In that case, the *Independent Business* court allowed the new manufacturing plant, Independent, to submit the issue of its earning potential—lost income

and profits—to the jury based on the profits earned by its sister company, IBF, Inc. IBF, Inc. had been in business from 1986 through 1989, had earned approximately $1.7 million in sales, when its owners decided to incorporate Independent for the purpose of taking over the manufacturing operations of their original business, IBF, Inc.

In reaching its decision, the *Independent Business* court considered the close and continuous relationship between the new manufacturing plant, Independent, and its sister company, IBF, Inc., the testimony of the CPA for the two companies, and Independent's expert witness on damages, both of whom observed that, Independent's operations were a continuation, or spin-off, of IBF, Inc.'s business. Ultimately, the court concluded that Independent should have been allowed to develop and pursue its lost profits claim using IBF, Inc.'s profits to establish its own earning potential. The court, however, subsequently stated:

> We are not in a position to determine whether Independent could have developed sufficient evidence to meet the stringent requirements of proving lost profits. Such a question is essentially a problem of proof and must be decided based upon the evidence developed. *Handi Caddy, Inc. v. American Home Products Corp.*, 557 F.2d 136, 139 (8th Cir.1977). For now, we simply hold the dismissal of the claim on summary judgment was premature and should therefore be reversed.

*Independent Business*, 127 F.3d at 704.

■ Although it is undoubtedly a close question, the court concludes that after viewing all the facts in the light most favorable to Ebert, the nonmoving party, Ebert has shown, with reasonable certainty, a prospective loss of net profits, such that dismissal on this claim on partial summary judgment would be premature. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348 (a court considering a motion for summary judgment must view all the facts in the light most favorable to

the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts); *Quick,* 90 F.3d at 1377 (same). Specifically, the court finds that Ebert's long-term contract with Hormel, under which he would receive the same prices for hogs that Nathan received, the fact that Ebert's hog finishing barn is equal in size to Nathan's, Nathan's affidavit in which he states the profits that he realized from producing hogs to Hormel (discussed in the next section), and the familiarity of the hog market, greatly reduce the degree of speculation such that the "new business rule" does not defeat Ebert's claim for lost income and profits. Furthermore, Hog Slat's argument that Ebert's ability to recover lost income and profits is precluded due to the fact that Ebert has not run a hog operation of any sort since 1980, and Hansen has never run a hog operation in his entire life, as explained in *Independent Business,* is inherently flawed. The flaw was elucidated by Chief Judge Posner in *MindGames, Inc. v. Western Publ'g Co.,* 218 F.3d 652 (7th Cir. 2000). In that case, Chief Judge Posner reasoned:

> Suppose a first-time author sued a publisher for an accounting, and the only issue was how many copies the publisher has sold. Under the "new business" rule as construed by Western [the defendant], the author could not recover his lost royalties even though there was no uncertainty about what he had lost. So construed and applied, the rule would have no relation to its rationale, which is to prevent the award of speculative damages.

*MindGames, Inc. v. Western Publ'g Co.,* 218 F.3d at 657. Chief Judge Posner's reasoning is equally applicable to the case at bar. If Ebert and Hansen were able to operate the allegedly unfit finishing barn, despite their collective inexperience, and realized a sum certain profit, according to Hog Slat's argument, Ebert and Hansen would nevertheless be precluded from re-

covering any lost income and profits they theoretically could incur. This argument, as Chief Judge Posner reasoned, is not persuasive because it has "no relation to [the new business rule's] rationale," which it to prevent the award of speculative damages. *Id.* Accordingly, Hog Slat's motion for partial summary judgment on Ebert's counterclaim for lost income and profits, based on "the new business rule," is also denied.

### 3. Does Ebert's counterclaim for lost income and profits fail as a matter of law because the Hormel contract still exists?

■ Hog Slat also contends that it is entitled to judgment as a matter of law on Ebert's claim for lost income and profits because the contract with Hormel still exists. Therefore, Hog Slat contends that Ebert's allegation—that Hog Slat's alleged delay in completing the construction of the finishing barn caused him to lose the contract with Hormel—is without merit. Moreover, because the contract with Hormel still exists, Hog Slat contends that Ebert and Hansen could still produce hogs for Hormel. The court, however, is not so convinced.

First, the court points out that Ebert's counterclaim does not specifically allege that Hog Slat's delay in completing the construction of the finishing barn caused him to lose the contract with Hormel. Rather, Ebert alleged, *inter alia,* the following: (1) there are numerous defects in the hog finishing building which Hog Slat constructed for Ebert such that the building is unfit to raise hogs; and (2) that he has sustained damages in terms of loss of income and costs to repair the building constructed by Hog Slat. Hog Slat is accurate in saying that Ebert testified during his deposition that the board at Hormel canceled the contract, however, he subsequently stated that the board reversed its decision. Deposition of Roger Ebert at 188.[1] Ebert's version of events is corrobo-

---

1. Neither party submitted Ebert's deposition in its entirety. The court finds that in this case, the follow up page—189, would have

been beneficial for it would have placed Ebert's comments regarding the reversal in a

rated by Nathan's testimony in which Nathan states that Hormel was going to cancel the contract, however, Hormel later decided not to cancel the contract. Deposition of Nathan Ebert at 15. Based on these corroborating statements, the court is not persuaded that Ebert unequivocally stated, as Hog Slat asserts, that the contract with Hormel no longer existed. Moreover, simply because Ebert's contract with Hormel still exists does not mean, as Hog Slat contends, that Ebert and Hansen can produce hogs for Hormel. Ebert's counterclaim against Hog Slat is grounded on the fact that he cannot produce hogs because the finishing barn built by Hog Slat is unfit for its intended use. Although Hog Slat points out Hansen's realization of profits from hogs he produced for Hormel in January of 2000, Hog Slat neglects to address the fact that Hansen finished these hogs in an "outdoor lot," and not in the finishing barn that is at issue.[2] Moreover, Nathan testified that since the production of that batch of hogs, Hansen was prevented from finishing any additional hogs for Hormel, because the "outdoor lot" that he used previously, was no longer available. Deposition of Nathan Ebert at 13–14. Thus, the court is not persuaded by Hog Slat's argument that, because the Hormel contract for hog production was never terminated, Ebert could have produced hogs for Hormel if he wished. As a result, Hog Slat's motion for partial summary judgment on Ebert's counterclaim of lost income and profits, based on this reason, is also denied.

### 4. Does Ebert's counterclaim for lost income and profits fail as a matter of law because Ebert allegedly would not have made any money had he put hogs in the finishing barn?

The court is likewise not persuaded by the final reason articulated by Hog Slat in support of its motion for partial summary judgment—that is, Ebert would not have made any money had he put hogs in the finishing barn. Hog Slat asserts that Ebert's claim for lost income and profits must fail because the conditions in the hog market were so bad that neither Ebert, nor Hansen, could have made a profit during the past two to three years. Hog Slat also contends that the testimony of Nathan and Hansen, in which both indicate that they have negative cash positions with Hormel, support its assertion that Ebert would not have realized any income and profits. Ebert, however, asserts the opposite, directing the court's attention to Nathan's affidavit, in which he states the following:

> I have a contract with Hormel Foods Corporation which Hormel buys butcher pigs from me. My contract with Hormel is the same as Roger Ebert's contract with Hormel.
>
> The batch of hogs that I started on July 20, 1999, was profitable. I bought 1,000 feeder pigs from a supplier in Canada for $25 per pig, and sold them for $105 per hog. After all expenses this resulted in a profit of approximately $20 per hog or approximately $20,000 per batch. I anticipate that my current batch of hogs will also be profitable. I bought

better context. However, because this page was not submitted, and as this is a motion for partial summary judgment, all reasonable inferences must be viewed in the light most favorable to the non-movant, Ebert.

**2.** In its reply brief, Hog Slat contends that because Hansen realized a profit from the Hormel contract, by producing this batch of pigs in the "outdoor lot," Ebert "simply needs to secure his share of the profits from Joel Hansen." Hog Slat Reply Brief at 4. This argument, however, misses the mark, because although Hansen realized a profit, he did so at the expense of finishing the hogs at a location different from the finishing barn built by Hog Slat. It must be remembered that Ebert's counterclaim for lost income and profits is based on his allegation that the Hog Slat's barn was inoperable, thus preventing Ebert from using the finishing barn which in turn prevented him from producing hogs for Hormel.

1000 feeder pigs from the same supplier in Canada for $60 per pig and my approximate sale price to Hormel will be $130 per hog. After expenses, I anticipate my profit to be approximately $10 per hog or approximately $10,000 per batch.

Affidavit of Nathan Ebert. Ebert also directs the court's attention to Hansen's affidavit in which he states:

In January 2000, I finished 834 head of hogs that I had started on August 4, 1999. These hogs were sold to Hormel for $99 a head.

The batch of hogs that I produced was profitable. I purchased my feeder pigs from the same supplier in Canada that Nathan Ebert uses. My profit for the entire batch was approximately $15,000 to $20,000 after expenses.

Affidavit of Joel Hansen.

The court agrees with Hog Slat's argument that because the hog market is bad and because hog prices have dropped, the probability of Ebert realizing any income and profits from the production of hogs is reduced. At the same time, however, the court cannot find, as a matter of law, that Ebert would not realize any income and profits from the production of hogs based on these same reasons. Additionally, the court finds fault with Hog Slat's reasoning that Ebert will not realize any income and profits because Nathan and Hansen testified that they are in a negative cash position with Hormel. The fact that Nathan and Hansen are in a negative cash position does not mean that Nathan and Hansen did not realize any income and profits from the production of hogs. Indeed, as demonstrated in their affidavits, both Nathan and Hansen testified that they did realize profits from their respective hog productions. Therefore, the court does not find that, as a matter of law, Ebert would not have realized any income and profit. Consequently, Hog Slat's motion for partial summary judgment based on these reasons, is also denied.

## IV. CONCLUSION

The court is not persuaded by the reasons articulated by Hog Slat in support of its Motion for Partial Summary Judgment on Ebert's counterclaim for lost income and profits. Therefore, Hog Slat's Motion for Partial Summary Judgment is **denied.**

**IT IS SO ORDERED.**