In the

# United States Court of Appeals
## For the Seventh Circuit

No. 01-2250

SHELBY COUNTY STATE BANK,
AN ILLINOIS BANKING CORPORATION,

*Appellant,*

*v.*

VAN DIEST SUPPLY COMPANY,

*Appellee.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 00-C-3326—**Jeanne E. Scott**, *Judge.*

ARGUED DECEMBER 5, 2001—DECIDED SEPTEMBER 17, 2002

Before COFFEY, RIPPLE, and DIANE P. WOOD, *Circuit Judges.*

DIANE P. WOOD, *Circuit Judge.* Hennings Feed & Crop Care, Inc. (Hennings) filed a voluntary bankruptcy petition under Chapter 11 on August 23, 1999, after Van Diest Supply Co. (Van Diest), one of its creditors, filed a complaint against it in the Central District of Illinois. Shelby County State Bank (the Bank), another creditor of Hennings, brought this action in the bankruptcy proceeding against Van Diest and the Trustee for Hennings to assert the validity of the Bank's security interest in certain assets of Hennings. Van Diest was included as a defen-

dant because the scope of Van Diest's security interest in Henning's assets affects the extent of the Bank's security interest. The Bank and Van Diest cross-moved for summary judgment, and the bankruptcy court granted the Bank's motion, finding that Van Diest's security interest was limited to the inventory it sold to Hennings (as opposed to the whole of Hennings's inventory). Van Diest appealed that order, and the district court reversed, finding that Van Diest's security interest extended to all of the inventory. Other claims that were at issue in those proceedings are not relevant to this appeal. The Bank now appeals. For the reasons set forth in this opinion, we reverse the decision of the district court and remand the case to the bankruptcy court.

## I

Hennings, a corporation based in Iowa, was in the business of selling agricultural chemicals and products. As is customary, several of Hennings's suppliers extended credit to it from time to time to finance its business operations, and obtained liens or other security interests in Hennings's property and inventory to safeguard their advances.

The Bank is among Hennings's creditors. In December 1997, the Bank extended credit to Hennings for $500,000. In May 1998, the Bank increased this amount to a revolving line of credit of some $4,000,000. Hennings in return granted the Bank a security interest in certain of its assets, including inventory and general intangibles. Van Diest, also a creditor, entered into several security agreements with Hennings and its predecessor over the years to protect its financing of materials supplied to Hennings. These agreements were covered by the Uniform Commercial Code, which Iowa has adopted (including the revised Article 9), see Iowa Code §§ 554.9101-554.9507 (1999).

A financing statement entered into by Hennings and Van Diest on November 2, 1981, provided for a blanket lien in "[a]ll inventory, notes and accounts receivable, machinery and equipment now owned or hereafter acquired, including all replacements, substitutions and additions thereto." On August 29, 1983, Hennings and Van Diest entered into a new security agreement (the Security Agreement), the language of which is at the core of this dispute. The Security Agreement was based on a pre-printed standard "Business Security Agreement" form. In the field for the description of collateral, the parties entered the following language, drafted by Van Diest, describing the security interest as being in

> [a]ll inventory, including but not limited to agricultural chemicals, fertilizers, and fertilizer materials sold to Debtor by Van Diest Supply Co. whether now owned or hereafter acquired, including all replacements, substitutions and additions thereto, and the accounts, notes, and any other proceeds therefrom.

The Security Agreement contained a further preprinted clause providing

> as additional collateral all additions to and replacements of all such collateral and all accessories, accessions, parts and equipment now or hereafter affixed thereto or used in connection with and the proceeds from all such collateral (including negotiable or non-negotiable warehouse receipts now or hereafter issued for storage of collateral).

The bankruptcy court found that the language of the Security Agreement was ambiguous and susceptible on its face to two interpretations: under one, the security interest extended to all of Hennings's inventory; under the other, it was limited to inventory sold to Hennings by Van Diest. Proceeding under Iowa law, that court applied several canons of contract interpretation to re-

solve the ambiguity. The upshot was that the court rejected the use of parol evidence and concluded that the Security Agreement extended only to inventory sold to Hennings by Van Diest.

The district court disagreed. It found that the bankruptcy court had created an ambiguity out of thin air and that the language of the Security Agreement supported only the view that the collateral included all inventory. It relied on the presence of the "after-acquired clause," which provides for future inventory to be deemed part of the collateral. Such a clause ensures that an entity having an interest in inventory retains the interest even when the original goods have been sold and replaced in the course of business, given the natural turnaround of inventory. See, *e.g.*, *Larsen v. Warrington*, 348 N.W.2d 637, 639 (Iowa 1984). To reach this conclusion, the district court found that the qualifier phrase mentioning specific items found in the first paragraph quoted above, while it concededly modified the term "inventory," was mere surplusage. Accordingly, it found that the description of "collateral" must have extended to "[a]ll inventory," and reversed the bankruptcy court's findings.

## II

As this case requires the interpretation of a contract, which is a question of law, we review the district court's decision *de novo*. *In re Frain*, 230 F.3d 1014, 1017 (7th Cir. 2000); *In re: Virtual Network Servs. Corp.*, 902 F.2d 1246, 1247 (7th Cir. 1990). The facts underlying the contract interpretation are not disputed in this case.

In accordance with the Security Agreement's undisputed choice of law provision, we apply Iowa law.

A.  Ambiguity of the "After-Acquired" Clause

In the process of divining the meaning of a contractual clause, a court must first establish whether the language in dispute supports more than one interpretation. The existence of such an ambiguity is a question of law, and under Iowa law, "[t]he test for ambiguity is objective: whether the language is fairly susceptible to two interpretations." *DeJong v. Sioux Ctr., Iowa*, 168 F.3d 1115, 1119 (8th Cir. 1999).

The description of the security interest in this case is a textbook example of ambiguous language: a term (all inventory) is followed by a qualifier (including all . . .) and then another (sold to Debtor by Van Diest). It is a basic rule of English syntax (of all syntax, in fact) that a modifier should be placed directly next to the element it aims to modify: placing two modifiers in a row leads to the question whether the latter one modifies only the first modifier, or modifies the entire term. In the first edition of his book on statutory interpretation, Sutherland described the "doctrine of the last antecedent" as providing that "[r]elative and qualifying phrases, grammatically and legally, where no contrary intention appears, refer solely to the last antecedent." J.G. Sutherland, Statutes and Statutory Construction § 267, at 349 (1st ed. 1891).

The Supreme Court recognized the existence of the "last antecedent" rule as early as 1799 in *Sims' Lessee v. Irvine*, 3 U.S. (3 Dall.) 425, 444 n.a (1799) ("The rule is, that 'such' applies to the last antecedent, unless the sense of the passage requires a different construction."). The Supreme Court of Iowa has also often endorsed resort to the doctrine in an attempt to resolve problems caused by ambiguously placed modifiers. See, *e.g.*, *State v. Lohr*, 266 N.W.2d 1, 3 (Iowa 1978) (recognizing grammatical as well as legal origins of the rule); *In re Peterson's Will*, 166 N.W. 168, 170-71 (Iowa 1918). The rule is now thought to extend

generally to the placement of all modifiers next to the term to be modified. See, *e.g.*, Bryan A. Garner, *Guidelines for Drafting and Editing Court Rules*, 169 F.R.D. 176, 195 (1997) ("To avoid ambiguity, place a modifier next to the word or phrase it modifies.").

### B. Canons of Interpretation and Extrinsic Evidence

As a linguistic matter, therefore, the sentence is ambiguous. As both the Supreme Court and Iowa courts have recognized (and, indeed, as Sutherland himself pointed out) the rule is helpful in determining the existence of the ambiguity, but not in solving the puzzle when both readings are plausible. See, *e.g.*, *Nobelman v. American Sav. Bank*, 508 U.S. 324, 330 (1993); *In re: Kruse's Estate*, 250 N.W.2d 432, 433-34 (Iowa 1977). Unless one always followed a rigid formalistic approach, the rule would not cast light on which of the two interpretations should prevail. Instead, courts (including those in Iowa) turn to other canons of interpretation. Under Iowa law, those other canons should be used to resolve an ambiguity before parol evidence may be introduced. See *Kibbee v. State Farm & Cas. Co.*, 525 N.W.2d 866, 868 (Iowa 1994). The rules in Iowa are the familiar ones used in contract interpretation in United States courts: the contract must be construed as a whole; the court requires a fair and reasonable construction; avoid illegality; the interpretation must account for surrounding circumstances; and the parties' own practical construction is relevant. Iowa also applies the rule requiring the court to construe terms against the drafter of the instrument (still known to those fond of Latin phrases as the rule of *contra proferentem*); it favors specific terms over general terms; and it favors handwriting to typing and typing to printing.

Construing the contract before us as a whole leaves as many doubts as we had at the outset: nothing within

it bears on the intended scope of the phrase "including but not limited to agricultural chemicals, fertilizers, and fertilizer materials sold to Debtor by Van Diest Supply Company." Van Diest could have acquired a security interest in everything that Hennings owned in inventory (as it had done, for instance, with the 1981 security agreement), or it could have limited its interest to the goods it supplied to Hennings. Without resort to other interpretive principles or to outside evidence, such as evidence of custom in the trade, it is impossible for a court to decide which reading the parties intended to adopt.

We do agree with the Bank's claim, however, that it would be bizarre as a commercial matter to claim a lien in everything, and then to describe in detail only a smaller part of that whole. This is not to say that there is no use for descriptive clauses of inclusion, so as to make clear the kind of entities that ought to be included. See, *e.g.*, *National Cash Register Co. v. Firestone & Co., Inc.*, 191 N.E.2d 471 (Mass. 1963). But if all goods of any kind are to be included, why mention only a few? A court required to give "reasonable and effective meaning to all terms," *AmerUs Bank v. Pinnacle Bank*, 51 F. Supp. 2d 994, 999 (S.D. Iowa 1999), must shy away from finding that a significant phrase (like the lengthy description of chemicals and fertilizers we have here) is nothing but surplusage.

Iowa law permits courts to consider the parties' conduct, such as the prior security agreements that Van Diest entered into with Hennings, as one way of resolving the ambiguity. Those earlier agreements at times provided for a blanket security with collateral in all inventory. This, too, is not terribly helpful here. On the one hand, the prior use of a general claim for all inventory demonstrates the availability in the trade of such a term and the willingness of Hennings, on occasion at least, to enter into such broad lien grants. On the other hand,

it tends to show that the parties knew how to achieve such a result if they wanted to. There must be a reason why the historically used "all inventory," was modified in this case.

More useful is the parties' own practical construction of this particular agreement—a source that Iowa courts agree may be consulted without opening the door entirely to parol evidence. See *Ackerman v. Lauver*, 242 N.W.2d 342, 347 (Iowa 1976). After the Security Agreement was executed, Van Diest sent to other lenders notices of its interest thereunder. In all the notices, it claimed a "purchase money security interest" only in the inventory it sold to Hennings. In a July 1993 letter to the Bank, for instance, Van Diest described its security interest as being in "[a]ll of Debtor's property (including without limitation all inventory of agricultural chemicals and additives thereto) purchased or otherwise acquired from the Secured Party. . . ." In the parenthetical, Van Diest then construed its own interest as being limited to the goods it sold to Hennings—not to the whole of Hennings's inventory, as it now claims.

It is true that this canon of construction treads remarkably close to the ground covered by extrinsic evidence. Furthermore, the course of dealing between principal parties A and B is not likely to shed light on the way that third party C should have understood an agreement. Where a third party disputes a reading of a contract, it is not in a good position to use course of dealing or other extrinsic evidence to support its position. It was not a part of the negotiations and does not have the access that we otherwise presume of both parties to outside materials relating to the contract.

The Bank also argues that contractual terms must be interpreted in a "commercially reasonable" fashion, even though the Bank has not supported this specific

proposition with references to Iowa law. Nevertheless, the somewhat broader requirement of a generally fair and reasonable construction is amply recognized in Iowa. See *Dental Prosthetic Servs., Inc. v. Hurst*, 463 N.W.2d 36, 38-39 (Iowa 1990). Of two plausible interpretations, we should assume the parties meant one that was fair and reasonable. The problem once again is that there is nothing inherently commercially unreasonable about either of the two possible readings. Under the circumstances, it would have been quite reasonable for Van Diest to get as much security from Hennings as it could, as the latter managed to ratchet up millions of dollars in debt before it went bust (it owes the Bank some $1,412,233.10; Van Diest had, at the time of the petition, some $2,890,288.75 in unpaid invoices; countless other creditors have lined up). On the other hand, it might have been unreasonable for Hennings to commit all of its potential collateral to Van Diest, if so doing might have made it more difficult for the company to obtain credit from others.

C. *Contra Proferentem*

As between the two parties to a contract, there is another doctrine that often resolves ambiguities: it is the rule requiring that ambiguous language must be construed against its drafter. Not only should the drafter be penalized by bearing the costs *ex post* of having cut corners *ex ante*, the penalty of interpretation against the drafter also aims to avoid overbearing behavior between contracting parties where the drafter, often the one in the better bargaining position, tries to pull a fast one over the party who can merely accept or reject the contract as a whole. Although this doctrine of *contra proferentem* is perhaps on the wane in some jurisdictions, it is alive and well in Iowa, *e.g.*, *DeJong*, 168 F.3d at

1121 (applying Iowa law), *Continental Ins. Co. v. Bones*, 596 N.W.2d 552, 558 (Iowa 1999), and in many interpretive contexts, see *DeGeare v. Alpha Portland Indus., Inc.*, 837 F.2d 812, 816 (8th Cir. 1988) (recognizing *contra proferentem* rule as a matter of federal common law).

Unlike many jurisdictions that relegate the *contra proferentem* rule to the status of "tie-breaker," see, *e.g.*, *Baker v. America's Mortgage Servicing, Inc.*, 58 F.3d 321, 327 (7th Cir. 1995) (Illinois law), Iowa takes a strong view of the rule, holding that ambiguous language is to be "strictly construed against the drafter." *Iowa Fuel & Mineral Co., Inc. v. Iowa State Bd. of Regents*, 471 N.W.2d 859, 863 (Iowa 1991); see also *Village Supply Co. v. Iowa Fund, Inc.*, 312 N.W.2d 551, 555 (Iowa 1981); *Fashion Fabrics of Iowa, Inc. v. Retail Investors Corp.*, 266 N.W.2d 22, 27 (Iowa 1978). *Cf.* RESTATEMENT (SECOND) OF CONTRACTS § 206 (1981) ("In choosing among the reasonable meanings . . . that meaning is generally preferred which operates against the party who supplies the words.").

Here, the drafting party was Van Diest. It was Van Diest that was trying to obtain a security interest in certain property of Hennings, in order to protect its advances to the latter. At least if this were a case against Hennings, the use of the *contra proferentem* rule would provide a way out of the ambiguity in the key contractual language: construing it against Van Diest, the security interest extends only to the products Van Diest sold to Hennings, not to "all inventory." It is not such a case, however, and so we turn to the final consideration that persuades us that the Bank must prevail.

D.  Third-Party Interests

The most compelling reason to construe the language of this agreement against Van Diest is the fact that it was

Van Diest that drafted the security agreement, and that the language of that agreement plays an important part for third-party creditors. Those creditors have no way of knowing what transpired between the parties; there is no parol evidence to which they may turn; and they have no way to resolve ambiguities internal to a contract. Here, we are not facing a garden-variety breach of contract action between the two contracting parties, both of whom were present during the negotiations. Instead, this case involves the effect of a contract between two parties (Hennings and Van Diest) on a third party (the Bank). The Bank, as we have already mentioned, is a stranger to the agreement, albeit one whose rights are affected by it. As the Bank could not have invested resources *ex ante* to avoid problems arising from ambiguous language, while Van Diest could have, it should be Van Diest who pays the price *ex post*.

A security agreement is a special kind of contract for which an important audience is third parties who need to know how much collateral has become encumbered. A potential creditor's decision whether to provide credit to Hennings (or anyone else), is contingent on the creditor's understanding of the extent of pre-existing security interests. An unclear statement of that extent should be avoided at all costs: if the creditor reads it reasonably, but too narrowly, when extending credit, it will be out of luck when the debtor defaults. If the potential creditor on the other hand takes a more conservative position and, fearful of the ambiguity, decides not to extend credit, the party seeking that credit is penalized in its access to capital by the shoddy work of its prior creditor— another result to be avoided.

By perfecting its security interest, Van Diest purported to give prospective creditors of Hennings notice of Van Diest's existing interest in Hennings's goods. A prospective creditor should have been able to look at Van

Diest's filing and determine on that basis whether to extend credit to Hennings. Here, the Bank presumably did so, especially when it received Van Diest's letter in July 1993 telling it that the Van Diest security interest covered only goods bought from Van Diest. Whether this statement alone would have justified reliance on the Bank's part is debatable; but coupled with the language in the perfected Security Agreement that was susceptible to this interpretation, reliance was certainly reasonable.

The Supreme Court has also noted the special position that third parties occupy, given their limited ways of learning about the existence or the precise extent of a security interest. In *United States v. McDermott*, 507 U.S. 447 (1993), the Court expressed concern over the possibility that an after-acquired security interest clause might prevent the Government from asserting its interests. Like the Bank, the Government could not have protected itself by contracting with the parties or by analyzing the terms of the clause. The underlying rationale for the decision is equally applicable here: for the notice requirement to be a valid instrument of protection for potential creditors, that notice must be clearly expressed, and it must be such as is needed to inform the behavior of the potential creditor. "When two private lenders both exact from the same debtor security agreements with after-acquired-property clauses, the second lender knows, by reason of the earlier recording, that that category of property will be subject to another claim, and if the remaining security is inadequate he may avoid the difficulty by declining to extend credit." *Id.* at 454. When the earlier recording is ambiguous, the "second lender" does not know what collateral will be at its disposal.

In a broad sense, the problem of later creditors is similar to the problem of any third-party beneficiary. In the context of pension or welfare funds, which might be third-

party beneficiaries to agreements between unions and multi-employer bargaining units, this court has held that the language of the collective bargaining agreement must stand on its own; it cannot be altered by oral agreements. See *Central States, Southeast and Southwest Areas Pension Fund v. Gerber Truck Serv., Inc.*, 870 F.2d 1148, 1154 (7th Cir. 1989) (*en banc*). Similarly, security agreements should be construed if at all possible without resort to external evidence, and they should be construed in a way that recognizes the important role they play for third-party creditors. Doing so here leads to the same result we have already reached: Van Diest's security interest extends only to the inventory it furnished. The limiting clause modifies the term "all inventory," and it is not surplusage.

## III

For these reasons, we REVERSE the judgment of the district court and REMAND the case to the bankruptcy court for the entry of judgment in favor of the Bank.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*